## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| **AMERICAN CREDIT ACCEPTANCE, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **CIVIL ACTION NO. _____** |
| **THE MAGIC AUTO SALES CORP. f/k/a** | ) | |
| **MONZON AUTO SALES INC.; DANILO** | ) | |
| **MONZON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

## I. PARTIES, JURISDICTION, AND VENUE

1.      Plaintiff American Credit Acceptance, LLC, (ACA) is a South Carolina limited liability company qualified to do business in Florida with its principal place of business in South Carolina.  ACA's members are citizens of South Carolina, Georgia, California, Missouri, and Illinois.  Accordingly, ACA is a citizen of South Carolina, Georgia, California, Missouri, and Illinois.

2.      Defendant The Magic Auto Sales Corp. f/k/a Monzon Auto Sales, Inc. (Monzon Auto) is a Florida Corporation with its principal place of business at 445 East 8th Avenue Hialeah, FL 33013.

3.      Upon information and belief, Defendant Danilo Monzon (Monzon) is a citizen of Florida, residing in Miami-Dade County.

4.      Monzon Auto and Monzon are hereinafter referred to collectively as "Defendants."

5.      This Court has subject matter jurisdiction over this case under 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000, exclusive of interest and cost, and is between citizens of different states.

6.      Venue is proper in this judicial district under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claims occurred in this judicial district.

## II. FACTUAL ALLEGATIONS

### A.      Background

7.      ACA is an indirect automobile finance company that is in the business of buying retail installment contracts entered into between automobile dealerships and individual consumers.

8.      Monzon Auto is an automobile dealership that is in the business of selling, and financing the sale of, automobiles to consumers using retail installment contracts.

9.      Monzon is or was, at all relevant times, the President of Monzon Auto.

10.     On June 30, 2016, ACA and Monzon Auto entered into a Dealer Agreement whereby ACA agreed to buy from Monzon Auto certain retail installment contracts entered into between Monzon Auto and its consumers.  Monzon signed the Dealer Agreement on behalf of Monzon Auto.

11.     In the Dealer Agreement, Monzon Auto made material representations and warranties about its conduct and the retail installment contracts it sold to ACA, including the following:

8.D.  Compliance with Law.  All business practices, acts and operations of Dealer are in compliance with all applicable federal, state and local laws, regulations and ordinances. . . .

*        *        *

9.A.  Credit Applications.  . . . .  To the best of Dealer's knowledge, and after conducting reasonable due diligence, the Credit Application and any credit information furnished to Finance Company by Dealer on behalf of applicant Buyer

is true, complete and accurate.  The due diligence procedures to verify such information are in compliance with applicable law, in addition to being sound and consistent with industry standards and followed by all employees. . . .  The provisions of this subsection shall apply to all Credit Applications submitted to Finance Company by Dealer, and not only to those that Finance Company purchases from Dealer.

*        *        *

C.  <u>Contracts</u>.  (i) Such Contract is valid and represents a genuine obligation of the Buyer(s) named therein, (ii) such Contract is legitimate, valid and binding in accordance with its terms, (iii) such Contract fully and accurately states the terms of the transaction between Dealer and Buyer, (iv) Dealer has not made any representations, warranties or agreements not contained in such Contract, . . . (vii) to the best of Dealer's knowledge, no suit or legal action or proceeding has been or will be brought or threatened to be brought by or against it in connection with such Contract, and (viii) such Contract is enforceable by Finance Company and its assigns.

D.  <u>Good Title and Assignment</u>.  Dealer has good and marketable title to the Vehicle, and such vehicle is free from all liens or encumbrances, except those which will be in favor of Finance Company.  Dealer has the right to make an assignment of such Contract.

E.  <u>Title, Security Interest and Lien</u>.  Dealer shall cause an application for title of the Vehicle to be submitted to the appropriate government agency within the time periods required by applicable law, including, without limitation, the time periods necessary to prevent the avoidance of the lien in a bankruptcy proceeding of the applicable Buyer.  Further, dealer shall take all steps necessary under applicable law to ensure that Finance Company will have a valid and properly enforceable first priority security interest in such Vehicle, and that such lien shall be enforceable.

F.  <u>Counterclaims and Defenses</u>.  Dealer has performed all of its obligations under such Contract, and Buyer has no offsets or counterclaims against or defenses to the enforcement of such Contract, except as enforcement may be affected by bankruptcy and similar laws affecting creditors' rights generally.  Without limiting the general application of the preceding sentence, Dealer has fully satisfied any and all warranties, expressed or implied, or any, made to the Buyer relative to the purchase of the Vehicle and Additional Products.

G.  <u>Insurance</u>.  At the time of Buyer's execution of such Contract, the Vehicle shall be covered by comprehensive and collision insurance protecting Finance Company's interest in such vehicle; and Finance Company shall be named lien holder and loss payee under such Insurance Coverage.  Upon request, dealer shall provide to Finance Company a copy of an insurance binder or a declaration

3

page insuring such vehicle in the name of the Buyer(s) with Finance Company named as loss payee.

H.  <u>Vehicle Branding</u>.  To the best of Dealer's knowledge, the Vehicle and all options therein are accurately described in such Contract, the title to such Contract is not branded indicating (i) that it is a salvage vehicle, (ii) that the odometer has been rolled back, (iii) that such Vehicle has had significant flood damage, (iv) that such vehicle is a gray market vehicle, or (v) that such vehicle has some other condition which has a significant adverse effect on the value of such Vehicle.

I.  <u>Down Payment</u>.  Unless specifically disclosed on the Contract, the down payment with respect to such Contract was paid in full by the Buyer, in cash, check, draft, immediately available funds, or in trade equity at the time of the purchase of the Vehicle, and no part of such down payment was loaned by Dealer or otherwise borrowed from the third party.

*          *          *

L.  <u>Forms and Procedures</u>.  Except for any forms, procedures or documents (or any forms, procedures or documents that Finance Company requires Dealer to utilize) provided by Finance Company, the forms, procedures and other documents created and used by Dealer in connection with the transactions contemplated hereunder, comply with all applicable requirements of . . . federal, state and local laws, regulations and rules.

*          *          *

N.  <u>Misstatements</u>.  Neither Dealer, nor anyone on Dealer's behalf, has made inaccurate, untrue, or misleading representations, warranties, statements, claims or comments regarding the Vehicle, any Additional Products, the financing (i.e., sale of the vehicle on credit), or with respect to any other matter relating to the Contract or the related transaction . . . .  Dealer shall notify Finance Company if it becomes aware that any information provided to Finance Company with regard to a Credit Application, Contract, or Buyer is not true or becomes untrue or inaccurate.

*          *          *

12.  <u>Responsibility for Sale</u>.  Dealer shall have the sole responsibility for the underlying sale transaction and for the nature, quality, and performance of the Vehicle and any Additional Products financed under any Contract.   Such responsibility includes any liability for any actions or omissions in connection with such sale of goods and services, for failure to deliver such goods or to perform such services, . . . and for any and all representations and warranties, express or implied, made in connection with such goods and services, whether by Dealer, the manufacturer or provider of the goods and services, or any third party.

12.     The Dealer Agreement further provides that, if Monzon Auto breaches any representation, warranty, or covenant with respect to a contract, it will repurchase the contract, stating:

> 15. <u>Contract Repurchase</u>. In the event that Dealer breaches a representation, warranty or covenant contained in Section 9 with respect to a Contract, Dealer shall, if required and demanded by Finance Company (i) repurchase such Contract from Finance Company and (ii) reimburse Finance Company for any fees and costs suffered by Finance Company as a result of such breach. To repurchase such Contract, Dealer shall pay to Finance Company the Repurchase Price. . . .

13.     ACA has recently discovered evidence that Monzon Auto provided false information and documents for 20 retail installment contracts that it sold to ACA, in an effort to induce ACA to buy the contracts.

14.     The nature, scope, timeframe, and consistency of the fraud suggests that Monzon Auto knowingly provided false information and documents to ACA or, at least, that it should have known it was providing false information and documents.

15.     The below-referenced 20 contracts, which Monzon Auto sold to ACA during an approximate two-month period from May 15, 2018, to July 25, 2018, are referred to cumulatively as the "Accounts."

### *The Toscano Account*

16.     On July 9, 2018, a person purporting to be Y. Toscano (Toscano) entered into a contract (the Toscano Contract) with Monzon Auto to finance the purchase of a 2017 Ford Expedition (Toscano Vehicle).  Monzon signed the Toscano Contract on behalf of Monzon Auto.

17.     ACA bought the Toscano Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Toscano and Toscano's creditworthiness.

18.     Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Toscano's finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statements provided by Monzon Auto to ACA with respect to the Contreras, Varela and Legon accounts discussed below.

19.     Additionally, and upon information and belief, the vehicle allegedly traded-in to Monzon Auto as part of the Toscano Contract was never actually traded in as represented.

20.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Toscano Contract.

21.     ACA would not have bought the Toscano Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

22.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Toscano Contract and demanding that Monzon Auto remit the repurchase price of $48,332.49 to ACA by October 18, 2018.

23.     To date, Monzon Auto has not repurchased the Toscano Contract.

### The Contreras Account

24.     On July 19, 2018, a person purporting to be I. Contreras (Contreras) entered into a contract (the Contreras Contract) with Monzon Auto to finance the purchase of a 2017 Ford Expedition (Contreras Vehicle).  Monzon signed the Contrares Contract on behalf of Monzon Auto.

25.     ACA bought the Contreras Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Contreras and Contreras' creditworthiness.

26.     Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Contreras' finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statements provided by Monzon Auto to ACA with respect to the Toscano, Varela and Legon accounts discussed herein.

27.     Additionally, and upon information and belief, the vehicle allegedly traded-in to Monzon Auto as part of the Contreras Contract was never actually traded in as represented.

28.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Contreras Contract.

29.     ACA would not have bought the Contreras Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

30.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Contreras Contract and demanding that Monzon Auto remit the repurchase price of $31,868.42 to ACA by October 18, 2018.

31.     To date, Monzon Auto has not repurchased the Contreras Contract.

### *The Varela Account*

32.     On July 11, 2017, a person purporting to be J. Varela (Varela) entered into a contract (the Varela Contract) with Monzon Auto to finance the purchase of a 2015 Mercedes-Benz S-Class (Varela Vehicle).  Monzon signed the Varela Contract on behalf of Monzon Auto.

33.     ACA bought the Varela Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Varela and Varela's creditworthiness.

34.    Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Varela's finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statements provided by Monzon Auto to ACA with respect to the Toscano, Contreras and Legon accounts discussed herein.

35.    In addition, Monzon Auto provided information to ACA representing that the odometer reading on the Varela Vehicle was 22,067 when the Varela Contract was entered on July 11, 2017.  Monzon initialed the odometer statement that was provided to ACA with respect to the Varela Vehicle.  Upon further investigation, ACA discovered that the odometer reading on the Varela Vehicle was 106,067, just two days before on July 9, 2017, indicating that the odometer was rolled back and/or that Monzon Auto misrepresented the mileage to ACA.

36.    ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Varela Contract.

37.    ACA would not have bought the Verona Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

38.    On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Varela Contract and demanding that Monzon Auto remit the repurchase price of $64,500.41 to ACA by October 18, 2018.

39.    To date, Monzon Auto has not repurchased the Varela Contract.

### The Legon Account

40.    On July 17, 2018, a person purporting to be J. Legon (Legon) entered into a contract (the Legon Contract) with Monzon Auto to finance the purchase of a 2017 Ford Expedition (Legon Vehicle).

41.     ACA bought the Legon Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Legon and Legon's creditworthiness.  Monzon signed the Legon Contract on behalf of Monzon Auto.

42.     Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Legon's finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statements provided by Monzon Auto to ACA with respect to the Toscano, Varela and Contreras accounts discussed herein.

43.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Legon Contract.

44.     ACA would not have bought the Legon Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

45.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Legon Contract and demanding that Monzon Auto remit the repurchase price of $37,366.25 to ACA by October 18, 2018.

46.     To date, Monzon Auto has not repurchased the Legon Contract.

### The Cervantes Account

47.     On July 25, 2018, a person purporting to be S. Cervantes (Cervantes) entered into a contract (the Cervantes Contract) with Monzon Auto to finance the purchase of a 2013 Ford F150 (Cervantes Vehicle).  Monzon signed the Cervantes Contract on behalf of Monzon Auto.

48.     ACA bought the Cervantes Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction.

49.     Significantly, Monzon Auto provided information to ACA representing that the odometer reading on the Cervantes Vehicle was 44,900 when the Cervantes Contract was entered on July 25, 2018.  Monzon initialed the odometer statement provided to ACA with respect to the Cervantes Vehicle.  Upon further investigation, ACA discovered that the odometer reading on the Varela Vehicle was 89,179, almost three years prior, on October 25, 2015, indicating that the odometer was rolled back and/or that Monzon Auto misrepresented the mileage to ACA.

50.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Cervantes Contract.

51.     ACA would not have bought the Cervantes Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

52.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Cervantes Contract and demanding that Monzon Auto remit the repurchase price of $30,076.04 to ACA by October 18, 2018.

53.     To date, Monzon Auto has not repurchased the Cervantes Contract.

### *The Cobiella Account*

54.     On July 23, 2018, a person purporting to be G. Cobiella (Cobiella) entered into a contract (the Cobiella Contract) with Monzon Auto to finance the purchase of a 2012 Ford Expedition (Cobiella Vehicle).  Monzon signed the Cobiella Contract on behalf of Monzon Auto.

55.     ACA bought the Cobiella Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction.

56.     Significantly, Monzon Auto provided information to ACA representing that the odometer reading on the Cobiella Vehicle was 58,990 when the Cobiella Contract was entered on

July 23, 2018.  Monzon initialed the odometer statement provided to ACA with respect to the Cobiella Vehicle.  Upon further investigation, ACA discovered that the odometer reading on the Cobiella Vehicle was 157,785, just three days prior, on July 20, 2018, indicating that the odometer was rolled back and/or that Monzon Auto misrepresented the mileage to ACA.

57.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Cobiella Contract.

58.     ACA would not have bought the Cobiella Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

59.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Cobiella Contract and demanding that Monzon Auto remit the repurchase price of $24,479.95 to ACA by October 18, 2018.

60.     To date, Monzon Auto has not repurchased the Cobiella Contract.

### The Ramos Account

61.     On July 16, 2018, a person purporting to be M. Ramos (Ramos) entered into a contract (the Ramos Contract) with Monzon Auto to finance the purchase of a 2016 Mercedes-Benz (Ramos Vehicle).  Monzon signed the Ramos Contract on behalf of Monzon Auto.

62.     ACA bought the Ramos Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Ramos and Ramos' creditworthiness.

63.     Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Ramos' finances.  The evidence of this fraud is unmistakable as the bank

statement is virtually identical to the bank statement provided by Monzon Auto to ACA with respect to the Quintero account discussed below.

64.     Additionally, upon information and belief, the vehicle allegedly sold as part of the Ramos Contract was not actually sold to Ramos as represented or, if it was sold as represented, was damaged in a way that had a significant adverse effect on its value.

65.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Ramos Contract.

66.     ACA would not have bought the Ramos Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

67.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Ramos Contract and demanding that Monzon Auto remit the repurchase price of $21,867.69 to ACA by October 18, 2018.

68.     To date, Monzon Auto has not repurchased the Ramos Contract.

### The Quintero Account

69.     On July 7, 2018, a person purporting to be C. Quintero (Quintero) entered into a contract (the Quintero Contract) with Monzon Auto to finance the purchase of a 2006 Jeep Wrangler (Quintero Vehicle).  Monzon signed the Quintero Contract on behalf of Monzon Auto.

70.     ACA bought the Quintero Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Quintero and Quintero's creditworthiness.

71.     Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Quintero's finances.  The evidence of this fraud is unmistakable as the bank

statement is virtually identical to the bank statement provided by Monzon Auto to ACA with respect to the Ramos account discussed above.

72.    ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Quintero Contract.

73.    ACA would not have bought the Quintero Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

74.    On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Quintero Contract and demanding that Monzon Auto remit the repurchase price of $14,996.09 to ACA by October 18, 2018.

75.    To date, Monzon Auto has not repurchased the Quintero Contract.

### The Ferro Account

76.    On July 10, 2018, a person purporting to be L. Ferro (Ferro) entered into a contract (the Ferro Contract) with Monzon Auto to finance the purchase of a 2013 Ford Focus (Ferro Vehicle).  Monzon signed the Ferro Contract on behalf of Monzon Auto.

77.    ACA bought the Ferro Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Ferro and Ferro's creditworthiness.

78.    Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Ferro's finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statement provided by Monzon Auto to ACA with respect to the Rodriguez account discussed below.

79. ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Ferro Contract.

80. ACA would not have bought the Ferro Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

81. On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Ferro Contract and demanding that Monzon Auto remit the repurchase price of $9,426.42 to ACA by October 18, 2018.

82. To date, Monzon Auto has not repurchased the Ferro Contract.

### The Rodriguez Account

83. On June 2, 2018, a person purporting to be A. Rodriguez (Rodriguez) entered into a contract (the Rodriguez Contract) with Monzon Auto to finance the purchase of a 2003 Ford Explorer (Rodriguez Vehicle). Monzon signed the Rodriguez Contract on behalf of Monzon Auto.

84. ACA bought the Rodriguez Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Rodriguez and Rodriguez's creditworthiness.

85. Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Rodriguez's finances. The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statement provided by Monzon Auto to ACA with respect to the Ferro account discussed above.

86. In addition, Monzon Auto provided information to ACA representing that the odometer reading on the Rodriguez Vehicle was 98,350 when the Rodriguez Contract was entered on June 2, 2018. Monzon initialed the odometer statement provided to ACA with respect to the

Rodriguez Vehicle.  Upon further investigation, ACA discovered that the last reported odometer reading on the Rodriguez Vehicle was 154,326, indicating that the odometer was rolled back and/or that Monzon Auto misrepresented the mileage to ACA.

87.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Rodriguez Contract.

88.     ACA would not have bought the Rodriguez Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

89.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Rodriguez Contract and demanding that Monzon Auto remit the repurchase price of $8,435.92 to ACA by October 18, 2018.

90.     To date, Monzon Auto has not repurchased the Rodriguez Contract.

### The Grant Account

91.     On June 30, 2018, a person purporting to be L. Grant (Grant) entered into a contract (the Grant Contract) with Monzon Auto to finance the purchase of a 2014 Nissan Altima (Grant Vehicle).  Monzon signed the Grant Contract on behalf of Monzon Auto.

92.     ACA bought the Grant Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Grant and Grant's creditworthiness.

93.     Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Grant's finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statement provided by Monzon Auto to ACA with respect to the P. Perez account discussed below.

94.     Additionally, upon information and belief, the vehicle allegedly trade-in as part of the Grant Contract either was not traded-in as represented or was not worth the trade-in allowance allocated due to vehicle damage.

95.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Grant Contract.

96.     ACA would not have bought the Grant Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

97.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Grant Contract and demanding that Monzon Auto remit the repurchase price of $10,528.70 to ACA by October 18, 2018.

98.     To date, Monzon Auto has not repurchased the Grant Contract.

### *The P. Perez Account*

99.     On June 27, 2018, a person purporting to be P. Perez (P. Perez) entered into a contract (the P. Perez Contract) with Monzon Auto to finance the purchase of a 2012 Volkswagen Jetta (P. Perez Vehicle).  Monzon signed the P. Perez Contract on behalf of Monzon Auto.

100.    ACA bought the P. Perez Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about P. Perez and P. Perez's creditworthiness.

101.    Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect P. Perez's finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statement provided by Monzon Auto to ACA with respect to the Grant account discussed above.

102.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the P. Perez Contract.

103.     ACA would not have bought the P. Perez Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

104.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the P. Perez Contract and demanding that Monzon Auto remit the repurchase price of $8,545.62 to ACA by October 18, 2018.

105.     To date, Monzon Auto has not repurchased the P. Perez Contract.

### *The Humes Account*

106.     On June 2, 2018, a person purporting to be L. Humes (Humes) entered into a contract (the Humes Contract) with Monzon Auto to finance the purchase of a 2005 Dodge Magnum (Humes Vehicle).  Monzon signed the Humes Contract on behalf of Monzon Auto.

107.     ACA bought the Humes Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction.

108.     Significantly, Monzon Auto provided information to ACA representing that the odometer reading on the Humes Vehicle was 98,190 when the Humes Contract was entered on June 2, 2018.  Monzon initialed the odometer statement provided to ACA with respect to the Humes Vehicle.  Upon further investigation, ACA discovered that the odometer reading on the Humes Vehicle was 168,581 at the last odometer reading reported by CarFax, indicating that the odometer was rolled back and/or that Monzon Auto misrepresented the mileage to ACA.

109.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Humes Contract.

110.    ACA would not have bought the Humes Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

111.    On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Humes Contract and demanding that Monzon Auto remit the repurchase price of $4,663.55 to ACA by October 18, 2018.

112.    To date, Monzon Auto has not repurchased the Humes Contract.

### The A. Perez Account

113.    On May 15, 2018, a person purporting to be A. Perez (A. Perez) entered into a contract (the A. Perez Contract) with Monzon Auto to finance the purchase of a 2004 Ford F250 (A. Perez Vehicle).  Monzon signed the A. Perez Contract on behalf of Monzon Auto.

114.    ACA bought the Varela Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about A. Perez and A. Perez's creditworthiness.

115.    Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect A. Perez's finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statements provided by Monzon Auto to ACA with respect to the Druna account discussed below.

116.    In addition, Monzon Auto provided information to ACA representing that the odometer reading on the A. Perez Vehicle was 121,366 when the A. Perez Contract was entered on May 15, 2018.  Monzon initialed the odometer statement provided to ACA with respect to the A. Perez Vehicle.  Upon further investigation, ACA discovered that the odometer reading on the

A. Perez Vehicle was 241,369 at the last reading reported by CarFax, indicating that the odometer was rolled back and/or that Monzon Auto misrepresented the mileage to ACA.

117.     Additionally, upon information and belief, the vehicle alleged trade-in as part of the A. Perez Contract was not actually traded-in as represented.

118.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the A. Perez Contract.

119.     ACA would not have bought the A. Perez Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

120.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the A. Perez Contract and demanding that Monzon Auto remit the repurchase price of $14,126.86 to ACA by October 18, 2018.

121.     To date, Monzon Auto has not repurchased the A. Perez Contract.

### The Druna Account

122.     On May 23, 2018, a person purporting to be A. Druna (Druna) entered into a contract (the Druna Contract) with Monzon Auto to finance the purchase of a 2005 Ford F250 (Druna Vehicle).  Monzon signed the Druna Contract on behalf of Monzon Auto.

123.     ACA bought the Druna Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Druna and Druna's creditworthiness.

124.     Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Druna's finances.  The evidence of this fraud is unmistakable as the bank

statement is virtually identical to the bank statements provided by Monzon Auto to ACA with respect to the A. Perez account discussed above.

125.    In addition, Monzon Auto provided information to ACA representing that the odometer reading on the Druna Vehicle was 113,215 when the Druna Contract was entered on May 23, 2018.  Monzon initialed the odometer statement provided to ACA with respect to the Druna Vehicle.  Upon further investigation, ACA discovered that the odometer reading on the Druna Vehicle was 317,459 at the time of the last reading reported by CarFax, indicating that the odometer was rolled back and/or that Monzon Auto misrepresented the mileage to ACA.

126.    ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Druna Contract.

127.    ACA would not have bought the Druna Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

128.    On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Druna Contract and demanding that Monzon Auto remit the repurchase price of $13,679.44 to ACA by October 18, 2018.

129.    To date, Monzon Auto has not repurchased the Druna Contract.

### *The Cancio Tamayo Account*

130.    On May 21, 2018, a person purporting to be Y. Cancio Tamayo (Cancio Tamayo) entered into a contract (the Cancio Tamayo Contract) with Monzon Auto to finance the purchase of a 2011 Porsche Panamera (Cancio Tamayo Vehicle).  Monzon signed the Cancio Tamayo Contract on behalf of Monzon Auto.

131.    ACA bought the Cancio Tamayo Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Cancio Tamayo and Cancio Tamayo's creditworthiness.

132.    Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Cancio Tamayo's finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statement provided by Monzon Auto to ACA with respect to the Batista account discussed below.

133.    ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Cancio Tamayo Contract.

134.    ACA would not have bought the Cancio Tamayo Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

135.    On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Cancio Tamayo Contract and demanding that Monzon Auto remit the repurchase price of $24,638.67 to ACA by October 18, 2018.

136.    To date, Monzon Auto has not repurchased the Cancio Tamayo Contract.

### The Batista Account

137.    On July 17, 2018, a person purporting to be M. Batista (Batista) entered into a contract (the Batista Contract) with Monzon Auto to finance the purchase of a 2017 Ford Expedition (Batista Vehicle).  Monzon signed the Batista Contract on behalf of Monzon Auto.

138.    ACA bought the Batista Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Batista and Batista's creditworthiness.

139.     Significantly, Monzon Auto provided ACA with a fabricated bank statement that purported to reflect Batista's finances.  The evidence of this fraud is unmistakable as the bank statement is virtually identical to the bank statement provided by Monzon Auto to ACA with respect to the Cancio Tamayo account discussed above.

140.     ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Batista Contract.

141.     ACA would not have bought the Batista Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

142.     On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Batista Contract and demanding that Monzon Auto remit the repurchase price of $37,572.63 to ACA by October 18, 2018.

143.     To date, Monzon Auto has not repurchased the Batista Contract.

### The Falcon Account

144.     On July 14, 2018, a person purporting to be M. Falcon (Falcon) entered into a contract (the Falcon Contract) with Monzon Auto to finance the purchase of a 2014 GMC Terrain (Falcon Vehicle).  Monzon signed the Falcon Contract on behalf of Monzon Auto.

145.     ACA bought the Falcon Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction, including information about Falcon and Falcon's creditworthiness.

146.     Specifically, upon information and belief, Monzon Auto provided ACA a finance application from Falcon that misrepresented Falcon's employment and income.

147.    Additionally, upon information and belief, the vehicle alleged trade-in as part of the Falcon Contract was not actually traded-in as represented.

148.    ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Falcon Contract.

149.    ACA would not have bought the Falcon Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

150.    On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Falcon Contract and demanding that Monzon Auto remit the repurchase price of $14,894.97 to ACA by October 18, 2018.

151.    To date, Monzon Auto has not repurchased the Falcon Contract.

### The Gonzalez Account

152.    On June 21, 2018, a person purporting to be L. Gonzalez (Gonzalez) entered into a contract (the Gonzalez Contract) with Monzon Auto to finance the purchase of a 2018 Ford Escape (Gonzalez Vehicle).  Monzon signed the Gonzalez Contract on behalf of Monzon Auto.

153.    ACA bought the Gonzalez Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction

154.    Upon information and belief, the Gonzalez Vehicle allegedly sold as part of the Gonzalez Contract was not actually sold to Gonzalez as represented or, if it was sold as represented, was damaged in a way that had a significant adverse effect on its value.

155.    ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Gonzalez Contract.

156.    ACA would not have bought the Gonzalez Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

157.    On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Gonzalez Contract and demanding that Monzon Auto remit the repurchase price of $27,563.32 to ACA by October 18, 2018.

158.    To date, Monzon Auto has not repurchased the Gonzalez Contract.

### The Robaina Account

159.    On June 28, 2018, a person purporting to be E. Robaina (Robaina ) entered into a contract (the Robaina Contract) with Monzon Auto to finance the purchase of a 2011 Buick Enclave (Robaina Vehicle).  Monzon signed the Robaina Contract on behalf of Monzon Auto.

160.    ACA bought the Robaina Contract from Monzon Auto after receiving, reviewing, and approving certain information relating to the transaction.

161.    Significantly, Monzon Auto provided ACA with a loan application for Robaina which contained false information regarding Robaina's employment and income.

162.    ACA reasonably and justifiably relied upon the information and documents provided by Monzon Auto in agreeing to buy the Robaina Contract.

163.    ACA would not have bought the Robaina Contract had it known of the misrepresentations and inaccuracies in the information and documents provided by Monzon Auto.

164.    On October 11, 2018, ACA sent a repurchase demand letter to Monzon Auto outlining its breach of the Dealer Agreement's representations with respect to the Robaina Contract and demanding that Monzon Auto remit the repurchase price of $13,640.09 to ACA by October 18, 2018.

165.     To date, Monzon Auto has not repurchased the Robaina Contract.

## COUNT I – BREACH OF CONTRACT
### (Monzon Auto)

166.     ACA realleges and reincorporates paragraphs 1 through 162, as if fully set forth here.

167.     ACA and Monzon Auto have an enforceable contract in the form of the Dealer Agreement.

168.     ACA has performed all of its obligations and is not in breach of the Dealer Agreement.

169.     As outlined above, Monzon Auto breached the Dealer Agreement by providing ACA with false information and documents for the Accounts as described in this Complaint. ACA has been damaged by Monzon Auto's breach because ACA purchased Accounts that it would not have otherwise purchased.

170.     Further, Monzon Auto has breached the terms of the Dealer Agreement by failing to repurchase the 20 Accounts identified above.

171.     As a result of World Class Auto's failure to repurchase the Accounts, ACA has suffered damages in the amount of $461,203.53.

172.     ACA is entitled to recover from Monzon Auto its attorneys' fees and costs incurred in prosecuting this lawsuit under the Dealer Agreement.

173.     All conditions precedent to the filing of this lawsuit have been fulfilled.

WHEREFORE, Plaintiff, American Credit Acceptance, LLC, respectfully requests that this Court render a judgment for damages, specific performance, interest, attorneys' fees and costs against Defendant, The Magic Auto Sales Corp. f/k/a Monzon Auto Sales, Inc., and for such other and further relief as this Court deems just and proper.

## COUNT II – FRAUD
### (Monzon Auto)

174.   ACA realleges and reincorporates paragraphs 1 through 162, as if fully set forth here.

175.   As outlined above, Monzon Auto made material false statements to ACA about the Accounts and the underlying borrowers when Monzon Auto provided the false Account information and documents to ACA for consideration.

176.   Monzon Auto knew that the statements were false when it made them.

177.   Monzon Auto made the statements to induce ACA to purchase the Accounts.

178.   ACA reasonably and justifiably relied upon the statements in agreeing to purchase the Accounts.

179.   ACA has been damaged by its reliance upon Monzon Auto's false statements and purchase of the Accounts because ACA now owns Accounts that it would not have otherwise purchased and upon which it is unable to collect/recover monies.

WHEREFORE, Plaintiff, American Credit Acceptance, LLC, respectfully requests that this Court render a judgment for compensatory and punitive damages, interest, attorneys' fees and costs against Defendant, The Magic Auto Sales Corp. f/k/a Monzon Auto Sales, Inc., and for such other and further relief as this Court deems just and proper.

## COUNT III – AIDING AND ABETTING FRAUD
### (Monzon)

180.   ACA realleges and reincorporates paragraphs 1 through 162, as if fully set forth here.

181.   Monzon Auto defrauded ACA by knowingly providing ACA with false information and documents for each of the Accounts.

182.    Monzon knew that Monzon Auto was defrauding ACA by providing ACA with false information and documents for each of the Accounts.

183.    Monzon substantially assisted in the commission of the fraud by falsifying or encouraging Monzon Auto employees and consumers to falsify information and documents for each of the Accounts.

184.    ACA reasonably and justifiably relied upon the false information and documents in agreeing to purchase the Accounts.

185.    ACA has been damaged by its reliance upon the false information and purchase of the Accounts because ACA now owns Accounts that it would not have otherwise purchased and upon which it is unable to collect/recover monies.

WHEREFORE, Plaintiff, American Credit Acceptance, LLC, respectfully requests that this Court render a judgment for compensatory and punitive damages, interest, attorneys' fees and costs against Defendant, Danilo Monzon, and for such other and further relief as this Court deems just and proper.

## COUNT IV – NEGLIGENT MISREPRESENTATION

186.    ACA realleges and reincorporates all the paragraphs above, as if fully set forth here.

187.    As outlined above, Monzon Auto made material false statements to ACA about the Accounts and the underlying borrowers when Monzon Auto provided the false Account information and documents to ACA for consideration.

188.    Monzon Auto either knew or should have known that the statements were false when it made them.

189.    Monzon Auto made the statements to induce ACA to buy the Accounts.

190.    ACA reasonably and justifiably relied upon the aforementioned statements in agreeing to purchase the Accounts.

191.    ACA has been damaged by its reliance upon Monzon Auto's false statements and purchase of the Accounts because ACA now owns Accounts that it would not have otherwise purchased and upon which it is unable to collect/recover monies.

WHEREFORE, Plaintiff, American Credit Acceptance, LLC, respectfully requests that this Court render a judgment for compensatory and punitive damages, interest, attorneys' fees and costs against Defendant, The Magic Auto Sales Corp. f/k/a Monzon Auto Sales, Inc.,and for such other and further relief as this Court deems just and proper.

Dated this 28th day of December, 2018.

/s/ Jonathan C. Brown
**Jonathan C. Brown, Esq.** (FL Bar No. 82148)
Sara L. Solano, Esq. (FL Bar No. 117966)
**BURR & FORMAN LLP**
350 East Las Olas Boulevard, Suite 1440
Ft. Lauderdale, Florida 33301
Telephone: (954) 414-6200
Facsimile: (954) 414-6201
Email: jbrown@burr.com
Email: flservice@burr.com
Email: ssolano@burr.com

Matthew T. Mitchell, Esq. (FL Bar No. 0018319)
BURR & FORMAN LLP
420 North 20th Street, Suite 3400
Birmingham, Alabama 35203
Telephone: (205) 251-3000
Facsimile: (205) 458-5100
Email: mmitchell@burr.com
Email: cwingate@burr.com
*Counsel for Defendant*